**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

DANIEL GEORGE GRIFFIN,

                        Plaintiff,

        v.                                                     No. 05-CV-1072
                                      (TJM/DRH)

JOHN J. DONELLI. Superintendent, Bare
Hill Correctional Facility; PIPEN, Sgt.; L.
JUBBERT, Deputy Superintendent of
Security; M. WARNER, Registered Nurse,
Bare Hill Correctional Facility; DANIEL
BENWARE, Director of Transitional
Services; T. BRIQUER, Correctional Officer;
and SGT. GARDNER,

                            Defendants.

_____

**APPEARANCES:**                              **OF COUNSEL:**

DANIEL GEORGE GRIFFIN
Plaintiff Pro Se
346-465
Patuxent Institution
7555 Waterloo Road
Jessup, Maryland 20794

HON. ANDREW M. CUOMO                    ADELE M. TAYLOR-SCOTT, ESQ.
New York State Attorney General         Assistant Attorney General
Attorney for Defendants
The Capitol
Albany, New York 12224-0341

**DAVID R. HOMER**
**U.S. MAGISTRATE JUDGE**

**REPORT-RECOMMENDATION AND ORDER**[1]

    Plaintiff pro se Daniel George Griffin ("Griffin"), an inmate formerly in the custody of the

New York State Department of Correctional Services (DOCS) and currently incarcerated in

Maryland, brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, seven

_____

    [1]This matter was referred to the undersigned for report and recommendation
pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

DOCS employees, violated his constitutional rights under the First, Eighth, and Fourteenth Amendments during his incarceration.  Am. Compl. (Docket No. 13).  Presently pending is the motion, of six defendants[2] for summary judgment pursuant to Fed. R. Civ. P. 56.  Docket No. 79, 85.  Griffin opposes the motion.  Docket No. 82.  For the following reasons, it is recommended that defendants' motion be granted in part and denied in part.

## I.  Background

The facts are related herein in the light most favorable to Griffin as the non-moving party.  See subsection II(A) infra.

At all times relevant to the present motion, Griffin was incarcerated at Bare Hill Correctional Facility ("Bare Hill").  Griffin Dep. (Docket No.79-2) at 2-158 (hereinafter "Dep."); Donelli Aff. (Docket No. 79-3) at ¶ 3.  Sometime after his arrival at Bare Hill, Griffin approached defendant Benware, the Supervisor for the Transitional Services Program, about becoming an Inmate Program Associate ("IPA").  Benware Decl. (Docket No. 79-5) at ¶¶ 5-6.  Benware provided Griffin with an application and arranged an interview.  Id. ¶ 6.  During the interview, Griffin candidly told Benware that he was "gay" and expressed concerns about problems which his sexuality had previously posed for his safety.  Benware Decl. ¶ 7; Dep. at 86-87.  Benware reassured Griffin that he had previously worked with multiple bisexual and homosexual inmates and that, as long as an inmate conducted himself appropriately, there were no problems.  Benware Decl. ¶ 8.  Griffin was

---

[2]Defendant Briquer has not joined in the motion and defendants agree that the resolution of Griffin's claims against Briquer require determinations of credibility by a jury.  See Defs. Mem. of Law (Docket No. 79-9) at 1 n.1.

recommended for the position by Benware and the recommendation was accepted by the Program Committee.  Benware Decl. ¶¶ 8-9; Dep. at 87.  Griffin was then assigned new housing in the I-1 dormitory, where all IPAs reside.  Benware Decl. ¶ 14.

Griffin was housed in the I dormitory for over a week before beginning his new IPA position.  Dep. at 98-99.  Thus, on or about November 30, 2003, prior to his commencement as an IPA but during his residence in I dormitory, Griffin had a conversation with a Muslim inmate about his bisexuality.  Dep. at 50-52.  After Griffin left the inmate's cell, Griffin noted that the inmate was immediately more hostile towards him.  Id. 50-52.  Later that evening, Griffin received a warning from other Muslim inmates that he should stay away from the inmate with whom Griffin had the earlier conversation.  Id. 54.

Within a week after Griffin joined the program, Benware received complaints about Griffin from a corrections officer in the I dormitory "stating that inmates in the dorm were complaining to the [corrections officer] that Mr. Griffin was 'cruising' around the bathrooms and cubicles at night, and was coming on to them and propositioning them."  Benware Decl. ¶ 15.  Benware was also approached by three inmates during programs "who complained that Mr. Griffin would position himself in an adjoining bathroom stall and make inappropriate statements or gestures.  More than one inmate in the program warned me that I had better keep Mr. Griffin away from them."  Id.  ¶¶ 16, 20.  Benware also observed Griffin making repeated and excessive trips to the bathroom during program hours, often leaving his assigned duties.  Id. ¶ 17.  Prison officials became concerned for security and noted an increase in disturbances in the dormitory.  Id. ¶¶ 19, 20.

Benware suspended Griffin from his position as an IPA on December 8, 2003.  Benware Aff. (Docket No. 79-5) at ¶¶ 4-5, 7, 8 & p. 9.  Griffin filed an inmate grievance

3

against Benware and wrote a letter to defendant Donelli, the Bare Hill Superintendent, seeking an investigation of his suspension.  Donelli Aff. ¶¶ 4-6; Docket No. 79-3 at 5-6, 8-9. Donelli assigned the task of investigating the matter to Linda Turner.  Donelli Aff. ¶¶ 7-8; Docket No. 79-3 at 35.  On December 17, 2003, Donelli denied Griffin's grievance stating that Griffin was assigned the position of IPA notwithstanding his sexual orientation, but his inappropriate sexual conduct resulted in a disturbance and disruption to his peers which constituted "a threat to security [that] can not be tolerated."  Donelli Aff. ¶¶ 9-11 & Docket No. 79-3 at 11.  Donelli's decision was appealed and affirmed.  Docket No. 79-3 at 10.

On December 9, 2003, Griffin was transferred from I dormitory to M-1 dormitory, a reassignment made by security personnel.  Donelli Aff. ¶ 12.[3]  The following day, Griffin was assaulted in the M-1 dormitory by four inmates.  Dep. at 58-60; Hearing Record (Docket No. 79-4) at 20-43 (hereinafter "Hearing").  The altercation started in the bathroom, Griffin broke away from his attackers and ran into the common room, grabbing a broom and swinging it in self defense.  Dep. at 58-60; Hearing at 12, 13-17.  A response team was called to help quell the altercation.

Gardner and Pepin were among those that responded.  Gardner Aff. (Docket No. 79-6) at ¶ 3; Pepin Aff. (Docket No. 79-6) at ¶ 3.  Pepin escorted Griffin to the medical unit.  Pepin Aff. ¶ 3; Gardner Aff. ¶ 7.  Prior to the escort, Pepin saw an inmate changing his bloody shirt who was allegedly involved in the assault on Griffin.  Docket No. 82 at ¶ 32.[4]  After Griffin

---

[3] Benware held no security position and he was not involved in the decision to transfer Griffin to a different dormitory.  Donelli Aff. ¶ 12; Benware Aff. ¶ 9.

[4] Griffin testified that Pepin failed adequately to investigate the assault because Pepin failed to bring Griffin additional photographs of inmates to identify the other inmates involved in the attack.  Dep. at 109-10.  However, Gardner was assigned to investigate the altercation.  Thus, Griffin's claims are misplaced and shall be discussed in relation to

was escorted from the M-1 dormitory, all dormitory residents were restricted to their cells. Gardner Aff. ¶ 7.

Griffin was examined by the medical department.  They found a superficial laceration on the left side of his scalp, a pea-sized area of swelling on his left forehead, an abrasion on his left cheek, redness in his left eye, superficial wounds to both knees, three small scratches on the back of his right hand, left shoulder pain, swelling in the right lower leg, and left elbow pain.  Docket No. 79-4 at 16; Docket No. 79-8 at 4; Warner Aff. (Docket No. 89-2)[5] ¶ 6 .  Treatment notes indicate that medical staff cleansed the superficial lacerations and abrasions and sent Griffin to an opthomologist for examination of his eye injury.  Docket Nos. 79-4 at 16, 79-8 at 4.  When Griffin was released from the medical unit, he reported no new physical injuries.  Docket No. 79-8 at 11.

On December 14, 2003, Griffin told medical staff that he believed he had a fractured rib. Docket No. 79-8 at 11; Warner Aff. ¶ 10.  Griffin was examined by Warner, who noted no acute distress despite his subjective complaints of pain, prescribed pain medication, and scheduled a doctor's appointment. Docket No. 79-8 at 11; Warner Aff. ¶ 11.[6]  Two days later, Griffin again complained of pain in his lower back and thigh and was given ibuprofen for pain relief.  Docket No. 79-8 at 12.  Griffin complained of rib cage pain again on December 20, 2003, but examination showed no difficulty breathing, no discoloration, no

---

Gardner.  Gardner Aff. ¶ 3.

[5] This submission represents the entire affidavit of defendant Warner.  It appears that there may have been a scanning error when the affidavit was filed, but Griffin's response indicates that he received the entire, unabridged affidavit.  Docket No. 89.

[6] Griffin was instructed to take Tylenol as needed.  Warner Aff. ¶ 11.  Each dormitory was provided a bulk supply that was accessible to Griffin at any time.  Id.

swelling, and good mobility.  Id. at 13; Dep. at 77-78.  Griffin was again given pain

medication to help keep him comfortable.  Docket No. 79-8 at 13.  For the next four months,

Griffin made no specific complaints of rib pain.  Id. at 13-27; but see id. at 14 (medical

record on December 29, 2003 regarding complaints of right quadrant pain and swelling).

During a medical appointment on February 24, 2004, Griffin mentioned sustaining

trauma to his chest and left eye due to an altercation.  Docket No. 79-8 at 29.  An x-ray was

taken which showed scar tissue and, according to Griffin, a broken rib that went untreated,

but no such reports are contained in Griffin's medical records.  Docket No. 82-4; but see

Dep. at 76-79 (claiming that missing x-ray was taken in late December or early January);

Warner Aff. ¶ 17.  The only radiology report of Griffin's chest, dated March 1, 2004 was

unremarkable.  Docket No. 79-8 at 30.[7]  Without treatment for the pain from the rib cage

injury, Griffin was forced to make compression bandages himself from his bed sheets.  Dep.

at 81.

In response to the December 10 altercation, Griffin was issued a misbehavior report for

violent conduct, creating a disturbance, failing to follow a direct order, and attempted

assault.  Jubert Aff. (Docket No. 79-4) at ¶ 6; Docket No. 79-4 at 8.  Defendant Jubert, the

Bare Hill Deputy Superintendent of Security, presided over the disciplinary hearing.  Jubert

Aff. ¶ 3.  Griffin was provided with pre-hearing inmate assistance.  Jubert Aff. ¶ 8; Docket

No. 79-4 at 11.  Griffin requested four witnesses, two inmates plus Briquer and Benware.

Hearing at 1.  The two inmates refused to testify on Griffin's behalf and Benware was

deemed to have no personal knowledge of the incidents and the only witness to testify was

---

[7] As this scan was in conjunction with complaints about asthma, Griffin contends that the scan did not go low enough to include the area of the blows he received during the December 10 altercation.  Dep. at 82-83.

Briquer.  Hearing at 1; Jubert Aff. ¶¶ 8-13.

The misbehavior report alleged that on the day in question, Griffin emerged from the

bathroom, with no one in pursuit, grabbed a broom, and attempted multiple times to hit an

inmate with the broom.  Docket No. 79-4 at 8.  During the hearing, Griffin admitted to

picking up the broom and swinging it in the common area twice.  Hearing at 12-14.  Jubert

found Griffin guilty of all charges, crediting the testimony of Briquer which was bolstered by

Griffin's own admissions, and finding that Griffin's actions of  "swinging a broom at other

inmates . . . created a risk of serious physical injury or death, and can not be tolerated in a

correctional setting."  Jubert Aff. ¶¶16-17; Docket No. 79-4 at 10; Hearing at 23.  Griffin was

sentenced to four months in the Special Housing Unit ("SHU").[8]  Jubert Aff. ¶ 19; Docket

No. 79-4 at 7; Hearing at 23.

Simultaneously with the disciplinary hearing, Gardner was conducting an investigation

into the events which occurred in the bathroom on December 10, 2003.  Based in part on

Gardner's findings that Griffin had been accused of making an inappropriate sexual

advance to a Muslim inmate and had recently been suspended from his IPA assignment for

inappropriate sexual behavior, Gardner "compiled a photo array of 10 inmates . . . ."

Gardner Aff. ¶¶ 9-10, 12.  Griffin identified three inmates from the array, two of which were

Muslims and the other was a Latin Kings gang member.  Gardner Aff. ¶ 13.  Additionally,

Griffin identified a fourth inmate, a Muslim, based upon his cell location, and asserted that

there was a fifth inmate involved although he could not describe the inmate.  Id. ¶ 14;

---

[8]SHUs generally "consist of single-occupancy cells grouped so as to provide separation from the general population . . . ."  N.Y. Comp. Codes R. & Regs. tit. 7, § 300.2(b). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required.  Id. at pt. 301.

Docket Nos. 79-3 at 20 & 79-6 at 7.  All four inmates were issued misbehavior reports for violent conduct.  Gardner Aff. ¶ 16.  Griffin was invited "to file a Voluntary Protective Custody request so that the alleged perpetrators could be identified as enemies . . . and to facilitate his transfer to another facility if approved . . . ."  Gardner Aff. ¶ 19.  On January 18, 2004, Griffin was transferred from Bare Hill.  Donelli Aff. ¶ 3.  This action followed.

## II.  Discussion

In his complaint, Griffin alleges that defendants retaliated against him for filing a grievance against Benware in violation of the First Amendment, were deliberately indifferent to his medical needs in violation of the Eighth Amendment, and violated his Fourteenth Amendment rights by (1) giving him no warning prior to suspending him from his IPA position,[9] (2) failing to assist him fully with the prosecution of those who assaulted him, (3) unfairly precluding him from calling Benware as a witness at his disciplinary hearing, (4) violating his Equal Protection rights by suspending him from the IPA position based on his sexuality, and (4) liberally construing the complaint, stealing Griffin's property.[10]  Defendants

_____

[9] While Griffin concedes that there is no protected liberty interest in prison work placement positions, he continues to dispute the fact that he was suspended without any prior warning or disciplinary charges.  Docket No. 82-2 at 10-11.  As there is no protected liberty interest in a work placement position, no procedural process is due when it is suspended or terminated.  See generally Valmonte v. Bane, 18 F.3d 992, 998 (2d Cir. 1994) ("[P]rocedural due process questions [are analyzed] in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.") (citing Kentucky Dep't of Corr. v. Thompson, 490 U.S. 454, 460 (1989)).  Therefore, any such claims are without merit and defendants' motion as to them should be granted.

[10] To the extent that Griffin alleges that he was deprived of his personal property without due process, such claims are not cognizable.  See Docket Nos. 82 ¶ 31 & 82-2 at 11.  Federal courts do not provide redress for the deprivation of property if there is an

contend that Griffin's claims are meritless and that he has failed to allege the personal involvement of Donelli.

## A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

---

adequate state court remedy available to a plaintiff. Hudson v. Palmer, 468 U.S. 517, 533 (1984). New York courts afford such a remedy through the initiation of an Article 78 proceeding. See N.Y.C.P.L.R. §§ 7803, 7804; see also Locurto v. Safir, 264 F.3d 154, 174 (2d Cir. 2001) ("An Article 78 proceeding permits a petitioner to submit affidavits and other written evidence, and where a material issue of fact is raised, have a trial of the disputed issue, including constitutional claims.") (citations omitted); Campo v. New York City Employees' Ret. Sys., 843 F.2d 96, 101 (2d Cir. 1988) ("Article 78 . . . provides a summary proceeding which can be used to review administrative decisions."). State law also provides that any individual, including an inmate, who seeks money damages against the State may commence an action for recovery only in the New York State Court of Claims. See N.Y. Corr. Law § 24(2). Here, Griffin contends in his later submissions that defendants stole his property, although it is unclear what property was stolen. First, however, the Article 78 procedure exists. Second, because Griffin is suing for damages, he must pursue these claims against New York State in the New York Court of Claims pursuant to Corrections Law § 24. Thus, judgment on these claims should be granted to defendants.

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment.  Gallo v. Prudential Residential Servs. 22 F.3d 1219, 1223-24 (2d Cir. 1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).

When, as here, a party seeks dismissal or summary judgment against a pro se litigant, a court must afford the non-movant special solicitude.  See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006); see also Sealed Plaintiff v. Sealed Defendant #1, 537 F.3d 185, 191 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se*, ... a court is obliged to construe his pleadings liberally.'" (citations omitted)).  However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion; the requirement is that there be no genuine issue of material fact.  Anderson, 477 U.S. at 247-48.

### B. Personal Involvement

Defendants contend that Griffin has failed sufficiently to allege and prove that Donelli was personally involved in any of the alleged constitutional deprivations.

"'[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'"  Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)).  Thus,

10

supervisory officials may not be held liable merely because they held a position of authority.

Id.; Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996).  However, supervisory personnel may

be considered "personally involved" if:

> (1) [T]he defendant participated directly in the alleged constitutional violation;
>
> (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;
>
> (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;
>
> (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or
>
> (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Williams v. Smith, 781 F.2d 319,

323-24 (2d Cir. 1986)).

Griffin has named Donelli as a defendant here as "overseer of [SHU] " with the authority

and duty to oversee Griffin's confinement.  Am. Compl. 2(C)(XXI).  However, a position in a

hierarchical chain of command, without more, is insufficient to support a showing of

personal involvement.  Wright, 21 F.3d at 501. Thus, Donelli cannot be held liable solely

because he held a supervisory position over other corrections officials.  There is no

allegation or evidence of direct involvement by Donelli in any constitutional violations.

However, Donelli was allegedly apprised of the potential retaliatory actions in Griffin's

grievance.   This arguably sufficed to give Donelli the requisite knowledge but, without more,

is also insufficient to establish personal involvement as there exists no evidence that Donelli

took any action.  See Bodie v. Morgenthau, 342 F. Supp. 2d 193, 203 (S.D.N.Y. 2004)

(holding that "mere receipt of a letter from a prisoner is insufficient to establish individual

liability"); Garrido v. Coughlin, 716 F. Supp. 98, 100 (S.D.N.Y. 1989) (holding that Commissioner of DOCS not personally liable for ignoring plaintiff's letter of protest and request for an investigation).

"The same is true if the only involvement of the supervisory official is to refer the inmate's complaint to the appropriate staff for investigation." Vega v. Artus, 610 F.Supp.2d 185, 198 (N.D.N.Y. 2009) (citing Ortiz-Rodriquez v. N.Y. State Dep't of Corr. Servs., 491 F. Supp. 2d 342, 347 (W.D.N.Y. 2007)).  It is undisputed that Donelli delegated the investigation into Griffin's grievance to Turner.  While he eventually signed the decision denying the grievance, there is nothing alleged nor does the record support contentions that Donelli did any more than simply approve Turner's investigatory conclusions.  Moreover, there exists no allegation or evidence that Donelli created an unconstitutional policy or custom or was grossly negligent in supervising.

Accordingly, defendants' motion as to Donelli should be granted on this ground.


### C. Retaliation

Liberally construing Griffin's submissions, he contends that his suspension, transfer, and subsequent assault were in retaliation for the grievances filed against Benware.  To state an actionable claim for retaliation, a plaintiff must first allege that the plaintiff's conduct was constitutionally protected and that this protected conduct was a substantial factor that caused the adverse action against plaintiff.  Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996).  "Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone."  Jackson v. Onondaga County, 549 F. Supp. 2d 204, 215 (N.D.N.Y. 2008) (citing Graham,

89 F.3d at 79).  Additionally, courts must view retaliation claims with care and skepticism to avoid judicial intrusion into prison administration matters.  Id.  Conclusory allegations alone are insufficient.  Id. (citing Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir. 1983).)).

Here, Griffin has failed to allege or prove facts to support a retaliation claim.  First, construing the facts alleged in the light most favorable to Griffin, he was engaged in filing grievances, an activity protected by the First Amendment.   However, his conclusory allegations, absent something more, are insufficient to maintain the present claim.  Id. Moreover, to the extent that his suspension may be regarded as retaliatory, as discussed infra at subsection II(E)(3), it was initiated for proper purposes.

Therefore, defendants' motion as to any retaliation claims should be granted.


### D.  Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment."  U.S. CONST. amend. VIII.  This prohibition extends to the provision of medical care.  Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994).  The test for a § 1983 claim is twofold. First, the prisoner must show that the condition to which he was exposed was sufficiently serious.  Farmer v. Brennan, 511 U.S. 825, 834 (1994).  Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm.  Id.  "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."  Id. at 844.

"'Because society does not expect that prisoners will have unqualified access to

healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim.  Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003)(quoting Hudson v. McMillian, 503 U.S. 1,9 (1992)).  Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain."   Brock v. Wright, 315 F.3d 158, 162-63 (2d Cir. 2003)(citing Chance, 143 F.3d 698, 702 (2d Cir. 1998)).  The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case.  Smith, 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs."  Chance, 143 F.3d at 702.  Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed."  Estelle v. Gamble, 429 U.S. 97, 104 (1976).  "Mere disagreement over proper treatment does not create a constitutional claim" as long as the treatment was adequate.  Chance, 143 F.3d at 703.  Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists . . .  are not adequate grounds for a section 1983 claim."  Sonds v. St. Barnabas Hosp. Corr. Health Servs., 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001).

Here, Griffin suffered a broken rib and head laceration.  Viewing the facts in the light most favorable to Griffin, he has sufficiently shown a serious medical need.  Torres v. New York City Dep't of Corrs., No. 93-CV-6296 (MBM), 1995 WL 63159, at *1 (S.D.N.Y. Feb. 15,

14

1995) (holding that "a broken rib could present a serious medical need" if treatment was not properly administered).

However, even construing the facts in the light most favorable to Griffin, nothing indicates that Warner was deliberately indifferent.[11]   Treatment records indicate that when Griffin arrived at the medical unit, he showed benign lacerations and abrasions which were cleansed.  The most serious injury, to his eye, was immediately examined by an opthomologist.  Treatment records also indicate that in the following ten days, Griffin was seen by the medical department five times, three of which were related to the assault. Docket No. 79-8 at 11-13.  When Griffin complained of pain in his ribs on December 14, he was noted not to be in objectively acute distress and was prescribed pain medication. Moreover, when he again complained of rib pain on December 20, his subjective complaints were belied by the medical examination which showed no difficulty breathing, no discoloration or swelling in the affected area, and a good range of motion.  Docket No. 79-8 at 13.  Objective examination again revealed benign results which were again treated with pain medication to ensure comfort.  There was no denial or delay of treatment.  To the extent that Griffin disagreed with the medical department's assessment that his pain was not an emergency necessitating x-rays, such differences of opinion are insufficient to support an Eighth Amendment claim.  Sonds, 151 F. Supp. 2d at 312.

Griffin's claims of a missing x-ray report are specious.  Conclusory allegations are wholly insufficient to support an Eighth Amendment violation at this stage.  Further, Griffin's own testimony, which states significantly different dates for the radiology test, also belies his

---

[11] Warner only provided care to Griffin on two occasions, December 10 and 14, 2003.  Warner Aff. ¶ 18.

claims of medical indifference.  See Docket Nos. 79-8 at 29 (indicating that Griffin had the x-ray on February 24, 2004) & 76-79 (claiming that missing x-ray taken in late December or early January);  Warner Aff. ¶ 17.[12]  Furthermore, there is a radiology result from March 1, 2004, dated a week after Griffin allegedly had the now lost first x-ray, which showed a completely normal chest scan with no abnormalities.  Docket No. 79-8 at 30.

Lastly, even if such an x-ray did exist showing a previously healed fracture, the medical record is replete with instances of the medical department providing Griffin with physical examinations and pain medication.  Therefore, the failure to order the x-ray earlier was, at worst, medical malpractice.  See Estelle , 429 U.S. at 107 ("[W]hether an X-ray . . . is indicated is a classic example of a matter for medical decision.  A medical decision not to order an X-ray . . . does not represent cruel and unusual punishment.  At most it is medical malpractice . . . .").  This is still insufficient to sustain a claim for deliberate indifference.  Id. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.")

Accordingly, defendants' motion on this ground should be granted.

### E. Fourteenth Amendment

### 1. Due Process

As a threshold matter, an inmate asserting a violation of his or her right to due process must establish the existence of a protected interest in life, liberty, or property. See Perry v.

---

[12] Medical records reveal a right rib x-ray on February 24, 2004, normal radiology results dated March 1, 2004, and a notation on April 7, 2004 that a test result obtained January 7, 2003 was negative.  Warner Aff. ¶¶ 17-18; Docket No. 79-8 at 30.  There is nothing to indicate that these notations are related and, as previously stated, the only verifiable x-ray report in the medical records is that from March 1.  Warner Aff. ¶ 18.

McDonald, 280 F.3d 159, 173 (2d Cir. 2001). To establish a protected liberty interest, a

prisoner must satisfy the standard set forth in Sandin v. Conner, 515 U.S. 472, 483-84

(1995). This standard requires a prisoner to establish that the deprivation was atypical and

significant in relation to ordinary prison life.  Id. at 484; Jenkins v. Haubert, 179 F.3d 19, 28

(2d Cir.1999); Frazier v. Coughlin, 81 F.3d 313, 317 (2d Cir.1996). The fact that an inmate

has been disciplined with a SHU confinement alone is insufficient to establish an atypical

and significant deprivation.  The Second Circuit has articulated a two-part test whereby the

length of time a prisoner was held in SHU as well as "the conditions of the prisoner's

confinement in SHU relative to the conditions of the general prison population" are to be

considered.  Vasquez v. Coughlin, 2 F. Supp. 2d 255, 259 (N.D.N.Y.1998).

The Second Circuit has noted that where the period of confinement exceeds thirty days,

"refined fact-finding" is required to resolve defendants' claims under Sandin.  Colon v.

Howard, 215 F.3d 227, 230 (2d Cir. 2000); see also Davis v. Barrett, 576 F.3d 129, 133-34

(2d Cir. 2009) (finding questions of fact under Sandin where plaintiff spent sixty days in

SHU).  Thus, as Griffin  spent 120 days in SHU confinement, questions of fact exist as to

the liberty interest asserted by Griffin.

While inmates are not given "the full panoply of [due process] rights," they are still

afforded procedural process.  Wolff v. McDonnell, 418 U.S. 539, 556 (1974).  Prisoners are

"entitled to advance written notice . . . ; a hearing affording him a reasonable opportunity to

call witnesses and present documentary evidence; a fair and impartial hearing officer; and a

written statement of the disposition including the evidence relied upon and the reasons for

the disciplinary actions taken."  Sira v. Morton, 380 F.3d 57, 69 (2d Cir. 2004) (citations

omitted).

17

Griffin does not argue that the written notice was inadequate, the hearing officer was biased, or the disposition was insufficient.[13]  Instead, he contends that he was deprived of due process when he was precluded from calling Benware as a witness to testify to the precipitating factors leading to the assault and subsequent disciplinary report.[14]  However, "[i]t is well settled that an official may refuse to call witnesses as long as the refusal is justifiable [such as] . . . on the basis of irrelevance or lack of necessity."  Scott v. Kelly, 962 F.2d 145, 146-47 (2d Cir. 1992) (internal quotation marks and citations omitted); see also Richardson, 833 F. Supp. at 152.

In this case, it is undeniable that Benware had no personal knowledge of the events which occurred on December 10, 2003.  He was not present in the M-1 dormitory, medical unit, or SHU.  Thus, his testimony would be based on what was told to him by others and would not be relevant to determine if Griffin's actions after exiting the bathroom and wielding the broomstick. The evidence relevant to the charges was presented during the hearing and Griffin verbally expressed his understanding and agreement to the decision.  Hearing at 19-20.  As Benware had no personal knowledge of the events which gave rise to the misbehavior report, there was a justifiable reason not to permit his testimony.

Thus, defendants' motion should be granted on this ground.

_____

[13] To the extent that the impartiality of Jubbert can be questioned, the record contains no evidence of prejudice, unfairness, or bias.  Additionally, Jubbert's decision was supported by sufficient evidence.  Even without the testimony of Briquer, Griffin's admissions that he swung the broomstick twice, in a crowded, central room is sufficient to establish his guilt on the charges contained in the report.

[14] Any allegations which state that the inmate witnesses should have been forced to testify, despite their refusals, are meritless.  See Wolff, 418 U.S. at 568-59 (leaving the decision in the sound discretion of the hearing officer to refuse to call an inmate witness that expresses his or her wishes not to testify);  Silva v. Casey, 992 F.2d 20 at 21-22 (2d Cir. 1993) (holding that hearing officer "had no power . . . to force [inmates] to testify.").

18

## 2. Right to an Investigation

Prisoners possess no constitutional right to have prison authorities investigate any particular matters.  Torres v. Mazzuca, 246 F. Supp. 2d 334, 342 (S.D.N.Y. 2003) (explaining that prison grievance procedures confer no substantive rights on inmates and, thus, there are no procedural protections which attach).  In this case, Griffin alleges that Garden and Pepin failed adequately to investigate the individuals who assaulted him by failing to bring him additional photographic arrays and confining individuals immediately upon their arrival.  However, Griffin has no right to obtain any investigation, no matter how reasonable it may appear and no matter how minimal, into this assault, especially one in which he defines the parameters.  Id. ("[T]he breadth of any investigation remains in the discretion of the officers conducting the investigation.").  Garden was assigned to conduct the investigation[15] and personally completed it.  Pepin was only responsible for escorting Griffin to the medical unit.  Thus, any contentions that these defendants was personally involved in a constitutional violation are meritless as (1) Griffin has no right to an investigation of any kind, and (2) even if he did, Pepin was not involved in conducting such an investigation.

Additionally, there exists no constitutionally protected right to file criminal charges against another.  See Langworthy v. Dean, 37 F. Supp. 2d 417, 422 (D. Md. 1999) ("[A] right to compel the prosecution of criminal activity does not exist.").  Thus, to the extent that Gardner should have been acting upon any of Griffin's requests to various state officials to

---

[15] Even though Gardner was not required to investigate at Griffin's behest, Gardner still performed a thorough investigation.  Gardner acquired interviewed multiple parties, developed a theory as to the motivation behind the attack, presented Griffin with a photographic array which produced three positive identifications, and then anticipated Griffin's future need for safety by inviting him to voluntary protective custody.

compel criminal prosecution of his assailants, such claims are not cognizable on federal review.

Accordingly, defendants' motion should be granted on this ground.


### 3. Equal Protection

The Fourteenth Amendment's Equal Protection Clause mandates equal treatment under the law.  Essential to that protection is the guarantee that similarly situated persons be treated equally.  City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985).

> [T]he Equal Protection Clause bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.

Vegas v. Artus, 610 F. Supp. 2d 185, 209 (N.D.N.Y. 2009) (internal quotation marks and citations omitted).  "Sexual orientation has been held to be a basis for an equal protection claim under Section 1983."  Id. (internal quotations and citations omitted).  "An equal protection analysis of discriminatory acts against homosexuals must be conducted pursuant to a rational basis test."  Anderson v. Branen, 799 F. Supp. 1490, 1492 (S.D.N.Y. 1992) (citing Woodward v. United States, 871 F.2d 1068, 1076 (Fed. Cir. 1973)).  Thus, in order to establish an equal protection violation, the plaintiff must show that "the disparity in treatment cannot survive the appropriate level of scrutiny which . . . means that he must demonstrate that his treatment was not reasonably related to any legitimate penological interests."  Phillips v. Girdich, 408 F.3d 124, 129 (2d Cir. 2005).

Any allegations that Benware discriminated on the basis of sexual orientation are

belied by the fact that he hired Griffin notwithstanding knowledge of his sexuality and only suspended him, rather than terminating him, from the IPA program.  Moreover, there are numerous legitimate penological interests which supported Benware's decision to suspend Griffin from his IPA position.  Benware's concerns for Griffin's actions, sexual and otherwise, were validated by a telephone call from a corrections officer verbalizing inmate discontent at how Griffin conducted himself, Benware's personal conversations with three inmates which indicated that Griffin's gestures made them uncomfortable and agitated, that these concerns were also shared by other inmates in the Transitional Program and the I dormitory, and Benware's own observations of Griffin's questionable conduct.  Benware Decl. ¶¶15-17.

Defendants correctly assert that "[o]rder, security, and the non-molestation of other inmates are valid and substantial penological interests that staff in a prison environment are entitled to, and are in fact required to act upon."  Docket No. 79-9 at 9-10 (citing Donelli Aff. ¶¶10; Benware Decl. ¶ 19).  Griffin's actions, despite his adamant claims of innocence, were completley observed by inmates, corrections officers, and administrators.  Thus, regardless of his sexuality, the manner in which Griffin conducted himself in the Transitional Program was reasonably perceived to threaten insitutional order.  This well-founded perception suffices to satisfy the rational bais test and constitutes a legitimate reason to suspend Griffin.

Accordingly, defendants' motion as to the equal protection claim should be granted


## III.  Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion for

summary judgment (Docket No. 79) be **GRANTED** in all respects and judgment be entered

for all defendants on all claims.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the

foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO**

**OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE**

**REVIEW**.  Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Secretary of HHS,

892 F.2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed R. Civ. P. 72, 6(a), 6(e).

Dated: November 24, 2009
        Albany, New York

_____

United States Magistrate Judge

22